| | |
|---|---|
| **GWENDOLYN BLACKWELL, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-2105** |
| **ST. CHARLES PARISH, ET AL.** | **SECTION: B(4)** |

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion for Summary Judgment (Rec. Doc. 114). Defendants oppose the motion, assert that it is "unreasonable, vexatious, and frivolous," and request attorneys' fees as a sanction. (Rec. Doc. 138). After consideration of the pleadings and applicable law, and for the reasons that follow,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment and Defendants' request for attorneys' fees are **DENIED**.

## BACKGROUND

Plaintiffs Gwendolyn Blackwell ("Blackwell"), Demona Harrison ("Harrison"), and Ophelia Wilson Walker ("Walker") assert claims of race discrimination against Defendants St. Charles Parish, Albert Laque ("Laque"), and St. Charles Parish Department of Community Services ("DCS")(collectively "the Parish") in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. Additionally, Plaintiffs claim the Parish's acts and omissions violated their rights under the First and Fourteenth Amendments to

the U.S. Constitution.

Plaintiffs are former employees of the DCS. Plaintiff Blackwell began working for the Parish on or about September 13, 1993, Plaintiff Harrison on or about April 16, 1992, and Plaintiff Walker in 1972. All three employees were terminated in June of 2004. The DCS affords social services to the community and is funded with federal and parish funds. Additionally, during Plaintiffs' tenure with the Parish, DCS employees did not enjoy civil service status. During this time, all DCS employees except one, Grace Read ("Read"), were African American.

In 1999, Plaintiffs worked with former Parish councilwoman Darnell Abadie ("Abadie") to have DCS employees recognized as civil service. Abadie wished to sponsor a council resolution to request civil service status for DCS employees. Abadie met opposition and the Parish told her that her request should be made to the Louisiana Attorney General to determine whether such an action was legal. Abadie argued that the request to the Louisiana Attorney General was unnecessary as the St. Charles Parish Home Rule Charter allowed the change to civil service status for DCS employees. Nonetheless, Abadie drafted and submitted a request to the Louisiana Attorney General. In January of 2003, the Louisiana Attorney General issued an opinion recommending that the Parish include DCS employees in the civil service.

Several meetings were held to consider the inclusion of DCS employees in the civil service. During one meeting in July 2003, the Parish Board Chair cautioned that civil service incorporation of the DCS may result in a reduction in department staffing. Plaintiffs were in attendance and made no objections. Subsequently, an ad hoc committee was formed to study the feasibility of the requested change in status. In September 2003, the Parish requested a proposal seeking bids from consultants to conduct a study and prepare a report on the DCS. The Parish accepted Ledet Managing Consulting's bid.

In 2003, Abadie ran for the political office of Parish President against incumbent, Albert Laque ("Laque"). Plaintiffs called Abadie and requested lawn signs to support her candidacy. Plaintiffs allege that Laque was aware that they supported Abadie. Thereafter, Laque allegedly expressed displeasure about their support of Abadie's candidacy and sent Parish employee Herman Weston ("Weston") to ascertain why Plaintiffs had Abadie signs in their yards. Plaintiffs did not receive merit raises in 2003.

On May 24, 2004, Ledet issued a report and recommendation ("the Ledet study") after conducting employee interviews and analyzing the DCS considering workload, services provided, programs offered, and recent computerization. Ledet concluded that DCS staffing exceeded that which was necessary to efficiently operate the department. Ledet recommended a reduction of three full-time positions.

On June 11, 2004, Parish President Laque wrote a letter to Chairman Breaux proposing civil service inclusion of the DCS and recommended eliminating Plaintiffs' positions. Six of the seven DCS positions approved for inclusion in the civil service were held by African American females. The seventh position was held by Read, a white female.

Plaintiffs contend that the Parish discriminated against them based on their race, African American, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. Additionally, Plaintiffs assert that the Parish's acts and omissions violated their rights under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs contend that the Parish was opposed to recognizing DCS employees as civil service employees because the DCS traditionally consisted of primarily African American employees. Plaintiffs further argue that Parish departments that consisted of a majority of white employees did not encounter similar obstacles to inclusion in the civil service. Ultimately, DCS employees were included in the civil service, but the Parish terminated Plaintiffs when their positions within the DCS were eliminated. Plaintiffs contend their termination was retaliatory because the Parish was dismayed with (1) Plaintiffs' pursuit of civil service status and (2) Plaintiffs' support of Defendant Laque's political opponent. Plaintiffs argue that they were "de facto" civil service employees and that their due process

rights were violated when they were denied civil service status and terminated without a hearing.

The Parish claims that Plaintiffs have no evidence of racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, or conduct in violation of Plaintiffs' rights under the First or Fourteenth Amendments to the U.S. Constitution. The Parish contends that the decision to terminate Plaintiffs' employment was supported by the findings in the Ledet study. Contrary to the contentions of Plaintiffs, the Parish asserts that Plaintiffs' race, political support of Abadie, and participation in the initiative to include DCS employees in the civil service did not play a role in the decision to eliminate their DCS positions. The Parish contends that Defendant Laque did not discriminate against Plaintiffs based on conduct protected under the First Amendment. In support of this contention, the Parish argues that Read, the DCS's sole white employee and an ardent supporter of Abadie's candidacy, was retained as a DCS employee.

The Parish contends that Plaintiffs and the DCS, which consisted almost exclusively of African American employees, were not treated any differently than similarly situated white Parish employees or majority white Parish departments. Defendants argue that Plaintiffs were not civil service employees, and thus they were not entitled to a hearing upon termination. As such, the Parish contends that Plaintiffs' rights under the Due Process

Clause of the Fourteenth Amendment were not violated.

**DISCUSSION**

**A.    Standard For Summary Judgment**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial responsibility of informing the Court of the basis of its motion and must point to the record to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. The substantive law will determine which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* A material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.* Evidence based on hearsay cannot be considered as part of the summary judgment inquiry. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n. 5 (5th Cir. 2001) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).

If the nonmoving party will bear the burden of proof of the dispositive issue at trial, the moving party may satisfy its

summary judgment burden "by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *See Celotex Corp.*, 477 U.S. at 325. Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, once the moving party has carried its burden pursuant to Rule 56(c), the nonmoving party must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir. 1998), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). The nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, demonstrate specific facts showing that there is a genuine issue of material fact to be resolved at trial. *See Celotex Corp.*, 477 U.S. at 325. Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Lijeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

**B. Race Discrimination Claims Under Title VII, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause**

Plaintiffs Blackwell, Harrison, and Walker assert claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment of the U.S. Constitution. Title VII, codified at 42 U.S.C. § 2000e-1 *et seq.*, prohibits an employer from discharging or

otherwise discriminating against any individual "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1) (2009). Section 1981 states that individuals of every race "shall have the same right ... to make and enforce contracts, to sue, be parties ... to the full and equal benefit of all laws and proceedings." 42 U.S.C. § 1981(a) (2009). Section 1983 creates civil liability for "every person who, under color of any statute, ordinance, regulation, custom, or usage" deprives any U.S. citizen of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (2009).

Employment discrimination claims brought under 42 U.S.C. §§ 1981 and 1983 are analyzed under the evidentiary framework applicable to claims brought under Title VII. *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999). Title VII inquiry focuses on whether the defendant *intentionally* discriminated against the plaintiff. *Alvarado v. Texas Rangers et al.*, 492 F.3d 605, 611 (5th Cir. 2007)(emphasis added). Intentional discrimination can be established through direct and circumstantial evidence. *Id.* (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)).

Title VII claims based on circumstantial evidence are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Id.* To be successful under the *McDonnell Douglas* framework, Plaintiffs must establish a

prima facie case of racial discrimination. *See Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). To establish a prima facie case, a plaintiff must show by a preponderance of the evidence that "he or she was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." *Id.* (citing *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001)).

If a plaintiff successfully establishes a prima facie case of racial discrimination, a presumption of intentional discrimination arises and the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Alvarado*, 492 F.3d at 611 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The burden to proffer a legitimate, nondiscriminatory reason for the adverse employment action is "one of production, not persuasion," and does not include an inquiry into the credibility of the articulated reason. *Id.* The defendant's burden of producing legitimate reasons for the action must be "clear and reasonably specific." *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). Although the burden of production shifts to the defendant during this stage, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 256.

If the defendant successfully bears its burden of production, the presumption of intentional discrimination created by the plaintiff's prima facie case dissolves and the burden shifts back to the plaintiff to demonstrate either that "(1) the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado*, 492 F.3d at 611 (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004)). Although the inference of intentional discrimination drops from the case once the defendant meets his or her burden of production, the trier of fact can still consider the evidence previously introduced to prove the plaintiff's prima facie case when considering whether the employer's proffered reason was the true reason for the adverse employment action or whether it was pretextual. *See Burdine*, 450 U.S. at 256 n. 10. A plaintiff's prima facie case, combined with sufficient evidence to demonstrate that the employer's proffered reason is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) (citing *Reeves*, 530 U.S. at 147).

"The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and ... neutral employment and personnel decisions." *McDonnell Douglas*, 411 U.S. at 801. Title VII, however, "does not

demand that an employer give preferential treatment to minorities or women" or "require the employer to restructure his employment practices to maximize the number of minorities and women hired." *Burdine*, 450 U.S. at 259. Rather, an employer "has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.*

Based on prior Court rulings, Plaintiffs argue that they have satisfied their burden of proving a prima facie case of racial discrimination. The Parish argues that there are genuine issues of material fact relating to whether Plaintiffs were "treated differently than others similarly situated." This inquiry is a central issue in analyzing whether Plaintiffs have proven a prima facie case of racial discrimination under the *McDonnell Douglas* framework. Specifically, the Parish contends that Plaintiffs were treated no differently than similarly situated white Parish employees and that the DCS was treated no differently than similarly situated majority white Parish departments. Thus, the Parish opposes Plaintiffs' contention that Plaintiffs have satisfied their burden of proving a prima facie case of racial discrimination.

Viewing the evidence with all reasonable inferences in the light most favorable to the Parish, there are genuine issues of material fact as to whether Plaintiffs have proven prima facie cases of racial discrimination and whether the Parish's proffered reason for the adverse employment decision, the Ledet study, was

pretext for unlawful discrimination.

First, all three Plaintiffs are African American. Thus, Plaintiffs are "members of a protected class" protected from racial discrimination under Title VII, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the U.S. Constitution. Second, the parties do not dispute that Plaintiffs were qualified for their positions with the DCS. Third, Plaintiffs were "subject to an adverse employment action." The Parish denied them civil service status during their tenure with the DCS and terminated them from their positions. Fourth, there are genuine factual disputes as to whether Plaintiffs were treated differently from other similarly situated non-African American Parish employees such as white DCS employee Read and whether the Parish treated the DCS differently from similarly situated majority white Parish departments.

Both Plaintiffs and the Parish proffer evidence in support of their opposing positions on this issue. Plaintiffs produce the affidavits of Read, Weston, Abadie, and Plaintiffs. (*See generally* Rec. Doc. 114; *see also* Rec. Doc. 144 at 5). Plaintiffs also proffer a compact disc containing a board member's comments at a Parish Council Meeting expressing concern about DCS employees "bumping" civil service employees in other Parish departments if the DCS was incorporated into the civil service. (*See* Rec. Doc. 144 at 6). Plaintiffs also proffer the Attorney General Opinion and the St. Charles Parish Home Rule Charter in support of their assertion

that the Parish discriminated against the DCS and them specifically based on their race. *Id.* at 5.

Conversely, the Parish produces evidence in support of its contention that Plaintiffs and the DCS were not treated differently than other similarly situated Parish departments or non-African American employees. The Parish proffers the affidavits of Sandra Zimmer ("Zimmer"), Parish Personnel Officer, Timothy Vial ("Vial"), Parish Chief Administrative Officer, and Albert Laque, Defendant and Parish President, in support of its assertion that the racial background of Plaintiffs and the DCS did not motivate the Parish's denial of civil service status or elimination of Plaintiffs' DCS positions. (*See* Rec. Docs. 138-2, 138-3, and 138-4). The Parish further produces the Ledet study and the deposition of Weston in support of its contention that the Parish's actions were not based on unlawful discrimination. (*See generally* Rec. Doc. 138).

When analyzing the Parish's Motion for Summary Judgment (Rec. Doc. 45), pursuant to the standard for summary judgment, the Court considered the evidence in the light most favorable to the nonmoving party, the Plaintiffs, and concluded that "Plaintiffs establish prima facie cases for racial discrimination." (Rec. Doc. 78 at 7). At the same time, the Court acknowledged that "[g]enuine issues of material fact exist regarding whether Plaintiffs were treated differently from others similarly situated based on race discrimination." *Id.* at 7-8.

Here, however, Plaintiffs move the Court to grant summary judgment in their favor. Under these circumstances, the Parish is the nonmoving party and the Court must construe the evidence related to disputed facts in the light most favorable to the Parish. *See Webb*, 139 F.3d at 536. The Parish, however, must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, demonstrate specific facts showing that there is a genuine issue of material fact to be resolved at trial. *See Celotex Corp.*, 477 U.S. at 325. The Parish produces the affidavits of Zimmer, Vial, and Laque, as well as the deposition of Weston in support of its contention that there is a genuine issue of material fact to be resolved at trial regarding the Parish's motivation in denying the DCS civil service status and eliminating Plaintiffs' DCS positions. (*See* Rec. Docs. 138-2, 138-3, and 138-4). In these affidavits, Zimmer, Vial, and Laque declare that Plaintiffs' race and exercise of their First Amendment rights did not influence the Parish's decision to deny them civil service status or eliminate their positions from the DCS. *Id.*

Plaintiffs argue that the Parish discriminated against them on the basis of race and treated others similarly situated (i.e. Read and majority white Parish departments) more favorably. The Parish, on the other hand, states that Read was employed with the Parish longer than Plaintiff Blackwell and that other similarly situated Parish departments were treated no differently from the DCS. Pursuant to summary judgment standards, the Court will view the

evidence in the light most favorable to the nonmoving Parish.

Accordingly, the Court finds that genuine issues of material fact exist as to whether other similarly situated Parish employees were treated more favorably than Plaintiffs, whether white DCS employee Read was better qualified for her DCS position than Plaintiff Blackwell, and whether the DCS was subject to additional requirements for inclusion in the civil service than similarly situated majority white Parish departments. All of these genuine issues of material fact are properly within the province of the trier of fact to resolve at trial.

Although the Parish has produced the Ledet study as the legitimate, nondiscriminatory reason for denying Plaintiffs civil service status and eliminating their positions within the DCS, Plaintiffs contest the legitimacy of the Ledet study. Plaintiffs argue that the Parish manufactured this seemingly legitimate, nondiscriminatory study in order to use it as a pretext to terminate Plaintiffs from their employment with the Parish. This factual dispute between the parties creates an additional genuine issue of material fact to be resolved by the trier of fact. Accordingly, Plaintiffs' Motion for Summary Judgment as to their claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause is **DENIED**.

## C.   **First Amendment**

In a First Amendment retaliation case, the Court determines as a matter of law whether Plaintiffs' speech involved a matter of

public concern. *Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994). To prevail on a First Amendment employment retaliation claim, Plaintiffs must establish four elements: (1) they suffered an adverse employment action; (2) their speech involved a matter of public concern; (3) their interest in commenting on matters of public concern outweighs the Parish's interest in promoting efficiency; and (4) their speech motivated the Parish's adverse employment action. *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005). Where the plaintiff's First Amendment retaliation claim rests on speech disputed between the parties, the Court must examine the speech as the defendant believed it to be. *Id.* at 185 (citing *Waters v. Churchill*, 511 U.S. 661 (1994)).

To determine whether the speech addresses a matter of public concern, the Court must determine the "content, form, and context" of given statements. *Id.* at 186. When a public employee addresses personal matters such as personnel disputes, that speech falls outside the scope of First Amendment protection. *Id.* However, "[w]hen the speech in question merely touches on an element of personal concern in the broader context of a matter of public concern . . . a court is not precluded from concluding that an employee's speech as a whole addresses a matter of public concern." *Id.* In "mixed speech cases," or cases in which the employee's speech involves both personal and public concerns, the employee's speech "nevertheless addresses public concern." *Id.* "Asking only whether the employee spoke in his [or her] capacity as a concerned

citizen or an employee yields uncertain results." *Salge*, 411 F.3d at 186. Accordingly, in "mixed speech cases," the Court will analyze the form, context, and content of the employee's speech. *Id.*

An issue of public concern does not involve "solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government." *Id.* Plaintiff's speech need not be made in a public forum for the speech to involve public concern. *Id.* Plaintiff's speech "may relate to the public concern if it is made against the backdrop of public debate." *Id.* at 187. An ongoing public debate about the subject of the employee's speech implicates a matter of public concern. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999).

In *Salge*, the Court concluded that while Ms. Salge's speech related to the conditions of her employment, a matter of personal concern, her statement regarding the employment status of her direct supervisor also involved a matter of public concern. *Id.* Among the factors that the Court weighed in ultimately concluding that her speech involved a matter of public concern subject to First Amendment protection were the ongoing public debate about school personnel decisions, her experience and reputation in the community, and the speech not relating to the personal circumstances of her employment. *Id.* at 188-191.

Plaintiffs allege they were terminated (1) because they

supported and participated in the cause to include DCS employees in the civil service and (2) because they supported the political opponent of Defendant Laque during the election for Parish President. Under the first prong of the First Amendment employment retaliation analysis, as stated previously, the Parish denied Plaintiffs civil service status and terminated them from their positions with the DCS. Both of these actions constitute "adverse employment action." Second, Plaintiffs' support for Abadie involved an election to determine who would become the presiding President over the Parish government. Thus, Plaintiffs' support of Abadie's political campaign "addressed a matter of public concern."

However, whether Plaintiffs' vocal support for DCS inclusion in the civil service addressed a matter of public concern is a more difficult question. Plaintiffs suggest that the DCS was not a part of the civil service system because the department has historically been a majority African American department. Plaintiffs' speech definitely reflected Plaintiffs' personal concern with their job security, employment benefits, and opportunities for career advancement. The broader context of potential racial discrimination and retaliation for the exercise of First Amendment rights, however, address areas of serious public concern. The Parish argues that Plaintiffs' objective in pursuit of civil service status was for personal gain only and, therefore, did not address a matter of public concern. Genuine issues of material fact exist as to whether Plaintiffs and the DCS were excluded from the civil service based

on race.

Third, the Parish does not argue that Plaintiffs' support of Abadie's political candidacy or their support and participation in the campaign to include DCS employees in the civil service is outweighed by the Parish's interest in promoting efficiency. Fourth, there are genuine issues of material fact concerning whether Plaintiffs' exercise of their rights under the First Amendment of the U.S. Constitution "motivated the employer's adverse employment action." For example, genuine factual disputes exist between the parties regarding Defendant Laque's knowledge of Plaintiffs' support of Abadie, Defendant Laque's knowledge of retained DCS employee Read's support of Abadie, and the degree of Laque's involvement in the termination process. Accordingly, Plaintiffs' Motion for Summary Judgment as to their First Amendment claims is **DENIED**.

## D. Equal Protection

As elaborated above, Plaintiffs claim that the Parish treated them less favorably than "others similarly situated." Plaintiffs claim that they were discriminated against on the basis of race and that the Parish treated similarly situated white Parish employees more favorably than Plaintiffs. Additionally, Plaintiffs claim that the Parish discriminated against the DCS, a majority African American department, on the basis of race, and treated similarly situated majority white Parish departments more favorably. For the reasons previously articulated in the section addressing

Plaintiffs' racial discrimination claims, genuine issues of material fact exist as to Plaintiffs' Equal Protection claims. Accordingly, Plaintiffs' Motion for Summary Judgment as to Plaintiffs' Equal Protection claims is **DENIED.**

**E.    Due Process**

An employee must have a property interest in continued employment to assert a due process claim in connection with termination. *Cabrol v. Town of Youngsville*, 106 F.3d 101, 105 (5th Cir. 1997)(*citing Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)). Such a property interest can stem from law, contract or understanding, "or perhaps a policy." *Id*. "There is no automatic property interest in continued government employment," and Louisiana law does not establish a right to continued employment "absent a contractual agreement for employment for a specified term or a legislative or regulatory restraint on a public entity's termination authority." *Blackwell v. Laque*, 275 Fed. Appx. 363, 368 (5th Cir. 2008)(*citing Cabrol*, 106 F.3d at 105); *Cabrol*, 106 F.3d at 106. However, "in Louisiana, a permanent classified civil service employee has a protected property interest in her job." *Blackwell*, 275 Fed. Appx. at 368.

The Parish argues that Plaintiffs were non civil-service at-will employees and Plaintiffs had no property interest in future employment. Accordingly, the Parish contends that Plaintiffs cannot maintain a due process claim. Plaintiffs argue that they were "de

facto" civil service employees and therefore were entitled to due process upon termination. Plaintiffs emphasize that the St. Charles Parish Home Rule Charter provides for civil service status for employees in departments such as the DCS and as such DCS employees were "de facto" civil service employees.

Genuine issues of material fact exist as to whether Plaintiffs were "de facto" civil service employees under the St. Charles Parish Home Rule Charter. Furthermore, Plaintiffs have not effectively argued that a "de facto" civil service employee would receive the same benefits as a formally recognized civil service employee. Accordingly, Plaintiffs have failed to meet the standard for summary judgment on the issue of due process and summary judgment as to Plaintiffs' Due Process claims is **DENIED**.

## F. Attorney Sanctions

Pursuant to 28 U.S.C. § 1927 and FED. R. CIV. P. 11, the Parish requests that the Court sanction Plaintiffs for what the Parish characterizes as an "unreasonable, vexatious, and frivolous" motion for summary judgment. (Rec. Doc. 138 at 23-25). The Court can properly sanction "any attorney or other person admitted to conduct cases" if that person "unreasonably and vexatiously" multiplies the proceedings. *See* 28 U.S.C. § 1927 (2009). The Court applies punishment "sparingly" under section 1927 and requires proceedings to be both "unreasonable" and "vexatious" to be sanctionable. *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir. 1994).

FED. R. CIV. P. 11 also imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the Court are well grounded in fact, legally tenable, and "not presented for any improper purpose" such as "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." *See* FED. R. CIV. P. 11 (2009). An attorney who certifies a document filed with the Court without such a substantiated belief is subject to sanctions including the payment of the other parties' expenses. *See id.* Although section 1927 and Rule 11 "are not identical ... they largely run in parallel." *Ratliff v. Stewart*, 508 F.3d 225, 232 n.9 (5th Cir. 2007).

In reviewing the Parish's request for attorneys' fees, the Court examines whether Plaintiffs "abused the judicial process" by burdening the Court and the Parish with a "baseless filing." *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1994). Under section 1927, the Parish must show that Plaintiffs had an improper purpose in filing their motion. *See Ratliff*, 508 F.3d at 234. For example, in *Ratliff*, the Court concluded that the imposition of attorney sanctions was proper where the plaintiff's attorneys failed to verify that they had sued the correct defendant even after the wrongfully sued party repeatedly informed the attorneys of their mistake. *Id.*

The Court denies the Parish's request for imposition of sanctions against Plaintiffs in the form of attorneys' fees. Plaintiffs' conduct, in filing their motion for summary judgment,

was not "unreasonable" and "vexatious" as required under section 1927. Further, the Court notes that punishment under section 1927 is applied "sparingly" and Plaintiffs' filing of the motion for summary judgment does not constitute the type of egregious attorney misconduct that section 1927 seeks to deter.

There has been no showing that Plaintiffs harbored an improper purpose in filing their motion. The Court is satisfied that Plaintiffs most likely did not intend "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." *See* FED. R. CIV. P. 11 (2009). Although genuine issues of material fact exist, Plaintiffs' motion for summary judgment does not rise to the level of unreasonableness, vexatiousness, and judicial abuse required under federal law. However, the Court shall closely monitor this action to assure maintenance of professional conduct.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment and Defendants' request for attorneys' fees are **DENIED**.

New Orleans, Louisiana this 3rd day of August, 2009.

_____
UNITED STATES DISTRICT JUDGE